**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **LEONARD LEE LIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:04-0460** |
| | ) | **Judge Trauger** |
| **v.** | ) | **Magistrate Judge Griffin** |
| | ) | |
| **MAPCO PETROLEUM, INC., d/b/a** | ) | **JURY DEMAND** |
| **MAPCO EXPRESS d/b/a/ DELTA** | ) | |
| **EXPRESS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Pending before the court is defendant MAPCO Express, Inc.'s ("MAPCO") Motion for

Summary Judgment (Docket No. 18), to which plaintiff Leonard Lee Light has responded

(Docket No. 22), and MAPCO has replied (Docket No. 25).  For the reasons stated herein,

defendant's Motion will be granted.

I.    **Factual Background and Procedural History**

Plaintiff Light is a resident of LaVergne, Tennessee and was employed by defendant

MAPCO as a store manager from January 1998 to March 2004.  (Docket No. 16, Exhibit B,

Deposition of Leonard Lee Light at 6; Docket No. 23, Plaintiff's Responses to Defendant's

Statement of Undisputed Material Facts at ¶¶ 6, 26–27.)  MAPCO operates gas stations and

convenience stores in various states (most of which are open twenty-four hours per day, seven

days per week), and its corporate headquarters are in Franklin, Tennessee.  (Docket No. 23 at ¶¶

1, 3.)  The plaintiff managed several stores during his employment with MAPCO (all twenty-

four hour, seven-day stores), including stores in Murfreesboro and LaVergne, but never managed

1

more than one store at a time. *Id.* at ¶¶ 6, 1, 3. At the time of the events that comprise the bulk of this action, the plaintiff was Store Manager at MAPCO's store in LaVergne, Tennessee. (Docket No. 16, Ex. B, Light Dep. at 25.)

The typical MAPCO store is staffed by a Store Manager, an Assistant Manager and other employees, usually referred to as Sales Associates or Cashiers. (Docket No. 23 at ¶ 3.) As Store Manager, the plaintiff had up to six employees under his supervision and on the payroll at any given time. *Id.* at ¶ 12. The plaintiff's duties as store manager included, but were not limited to the following:

> Interviewing prospective employees; staffing the store, including scheduling employees and making arrangements to ensure the store was covered when an employee was absent; evaluating other employees in his store (including the Assistant Manager); disciplining employees in his store, including through verbal counselings [sic], written warnings and suspension; recommending the hiring, promotion and termination of employees in his store; determining whether terminated employees were eligible for rehire; recommending pay raises for employees in his store; approving overtime work by employees when needed; training new employees on various issues including cash controls, MAPCO's smoking policy, MAPCO's policy on the lawful sale of alcohol, and how to deal with shoplifters and clock in and out; handling complaints from employees and customers; reconciling case receipts with sales and accounting for any discrepancies between the two; making cash depositis (or ensuring that an employee under his supervision made such deposits); ordering and receiving store inventory; approving or disapproving employee vacation requests; controlling store expenses; and making sales budget.

*Id.* at ¶ 7. In addition to these duties, the plaintiff was responsible for ensuring that his store was adequately staffed, and he was the only employee in the store with access to payroll. *Id.* at ¶¶ 8, 15. It is also undisputed that the "Plaintiff's major responsibilities were sales growth, profit growth, expense control, inventory control and cash control." *Id.* at ¶ 7.

The MAPCO Manager's Handbook explains that its managers are paid on a salaried basis and observes that "exempt" is the legal classification for their positions. (Docket No. 23 at ¶ 4; Docket No. 17, Declaration of Beverly Cooper, Exhibit 1, Employee Handbook at 11.) The

handbook states that the managers are not paid an hourly rate or paid for overtime. (Docket No. 23 at ¶ 5; Docket No. 17, Cooper Decl., Ex. 1 at 11.) They are the only employees working in the stores who are eligible for bonuses, which are given out based on their store's performance. (Docket No. 23 at ¶ 5.) In contrast to the Managers, Sales Associates and Assistant Managers are paid an hourly wage and receive overtime compensation if they work more than 40 hours per week. *Id.* at ¶ 4. The plaintiff's salary was at least $38,000 per year, not including bonuses. *Id.* at ¶ 17. At the time of his termination, the plaintiff's salary was $39,400. *Id.* In contrast, the employees under the plaintiff's supervision were paid at an hourly rate ranging from $6.50 to $9.50 per hour. *Id.* at ¶ 28.

The handbook estimates that the management duties will require a manager to work approximately fifty hours per week, but notes that business demands may cause this number to fluctuate. (Docket No. 23 at ¶17; Docket No. 17, Cooper Decl., Ex. 1 at 11.) Plaintiff's usual hours, which he scheduled himself, were from 6 a.m. to 4 p.m. Monday through Friday. (Docket No. 23 at ¶ 17.) At any time the plaintiff was not scheduled to work, he was "on call," meaning that employees would call him unexpectedly to go to the store and deal with situations that might arise. *Id.* at ¶ 9. The plaintiff estimates that, between his scheduled hours and times he was called at home by another employee to go in and deal with an emergency, he actually worked an average of sixty-five hours per week. *Id.* at ¶ 14. He estimates that, during at least sixty percent of that time, one or more other employees were working with him at the store. *Id.* He also estimates that thirty percent of the average fifteen hours over the required fifty he worked each week was because someone did not show up for work, and seventy percent was because of problems at the store. (Docket No. 16, Ex. B, Light Dep. at 123.)

The number of employees required to work in the store varied, depending on the time of day and whether an employee was unexpectedly absent.  (Docket No. 23 at ¶ 13.)  If an employee did not show up for work, the plaintiff had the option of bringing another employee in early, keeping an employee late, asking an employee who was not scheduled to work to come in, trying to arrange for an employee from another MAPCO store to work, or working himself.  *Id*. at ¶ 16.  If necessary, the plaintiff could contact Randy Wilson, his district manager and immediate supervisor, for assistance.  *Id*.

In addition to his own managerial duties, the plaintiff testified that he regularly cleaned out the restroom, took out trash, washed windows, and put out advertising signs.  (Docket No. 16, Ex. B, Light Dep. at 196–98.)  The plaintiff also stated that he and a group of employees painted the outside of another store several times and that he painted the curb at his own store.  *Id*. at 147–48.  The plaintiff testified that he felt like he was performing more menial duties, "off and on throughout the years, but there toward the end pretty strongly."  *Id*.  He explained that he was "spending more time behind the register and less time managing the operation."  *Id* at 146.  He claims that the reason this happened, and the reason it had been happening even more the year before his termination, was because the store was "short of help."  *Id*. at 152.

The plaintiff contends that he complained about his pay in relation to the number of hours he worked on a number on occasions.  He testified that, on a regular basis at district manager meetings, he and other managers told Wilson, "We didn't make enough for what we did. I mean that's basically the complaint as far as pay goes. We had discussed, you know, working all the hours and not getting compensated for it.  That subject came up regularly."  *Id*. at 141.  In addition, he claims that, approximately one month before he was terminated, he called Wilson and told him, "I was tired of not knowing when I was going to be there and when I

4

wasn't, I was tired of working double shifts. I worked third shift and then had to work first shift all day long, too." *Id*. at 136. The plaintiff testified that he also told Wilson, "I was tired of all the extra hours, you know, putting in all the time and not being able to get ahead." *Id*. at 137. During that phone call, he told Wilson to start looking for a replacement. *Id*. It is undisputed that he did not mention the FLSA when he talked to Wilson at that time. (Docket No. 23 at ¶ 19.)

On Friday, March 26, 2004, about a month after his complaint to Wilson, the plaintiff received a call at home from an employee who told him that Kimberly Burns, another employee at his store, had been cited for selling beer to a minor. *Id*. at ¶ 20. Alcohol sales at the plaintiff's store comprised about fifty percent of all sales, not including gas sales. *Id*. at ¶ 22. If an employee is found to have sold beer to a minor, both the employer and employee may be fined and, after three such incidents, the store's beer license may be revoked. *Id*. at ¶ 21. MAPCO's disciplinary policy states that, if a manager is cited for violation of alcohol or tobacco laws, he or she "will be terminated." (Docket No. 16, Ex. B, Light Dep. at 157.) MAPCO trains all new employees on its alcohol policies and also requires Store Managers to give the employees alcohol awareness quizzes every six months. (Docket No. 23 at ¶ 22.)

In his deposition, the plaintiff explained that Burns was supposed to work during that weekend, and that, at the time in question, the store was shorthanded. (Docket No. 16, Ex. B, Light Dep. at 161.) The plaintiff testified that he called his existing employees but all three were unavailable and, because Light was ill, he could not cover Burns's shifts himself. (Docket No. 16, Light Dep., Ex. B at 164; Docket No. 23 at ¶ 23.) The plaintiff claims that he then called Wilson on Saturday, March 27, 2004, but reached another store manager, a peer of Light's, instead. (Docket No. 23 at ¶ 24.) Wilson had given the other manager his phone because he was

5

out of town for the weekend.  *Id*.  Upon reaching the other manager, Light told the manager to have Wilson call him when he returned to Nashville.  (Docket No. 16, Ex. B, Light Dep. at 165.)  After these attempts to find a replacement, the plaintiff allowed Burns to work Saturday, Sunday and perhaps Monday, even though it is undisputed that he believed she would be terminated due to MAPCO's alcohol policies.  (Docket No. 23 at ¶ 25.)

Wilson became aware of the citation and the plaintiff's subsequent actions on Tuesday, March 30, 2004.  *Id*. at ¶ 26.  He discussed the matter with George Grayson, who, as the Division Manager of MAPCO's Nashville Division, was Wilson's immediate supervisor and the plaintiff's second-level supervisor.  *Id*. at ¶ 2, 26.  Both agreed that, if Burns had been cited and Light had still allowed her to work, then Light should be terminated.  *Id*. at ¶ 26.  Wilson went to the store, spoke with the plaintiff and, when he had verified the story, terminated the plaintiff.  *Id*. at ¶ 27.  No mention was made of the plaintiff's prior complaints about his pay and hours during this conversation.  *Id*.

On May 20, 2004, the plaintiff filed a Complaint in this court, asserting that the defendant had failed to pay him overtime pursuant to an improper classification in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and that the defendant had terminated him in retaliation for his alleged complaints about compensation and hours worked in violation of the FLSA.  (Docket No. 1 at ¶¶ 7, 10.)  On June 22, 2004, the plaintiff filed the First Amended Complaint to correct the name of the defendant.  (Docket No. 5 at ¶ 2; Docket No. 3)  This matter is presently before the court on defendant's Motion for Summary Judgment.

6

II.    **Analysis**

A.    **Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255.

The court should also consider whether the evidence presents "a significant disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

B.     **Exemptions from the FLSA Overtime Provision**

The plaintiff contends that the defendant violated the FLSA by failing to compensate him for the overtime hours he worked. The defendant argues that the plaintiff is a bona fide executive and, therefore, is exempt from the FLSA overtime requirements.

8

Section 207 of the FLSA directs an employer to compensate an employee who works over forty hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207 (2004). The provisions of Section 207, however, do not apply to all employees. Section 213 of the FLSA entirely exempts employees hired in a bona fide executive, administrative, or professional capacity from the requirements of Section 207. 29 U.S.C. § 213 (2004). Although Congress did not define the terms "executive, administrative, or professional," it delegated to the Secretary of the Department of Labor ("DOL") the responsibility of promulgating regulations to implement and clarify the Act. *See* 29 U.S.C. § 213(a)(1); *Auer v. Robbins*, 519 U.S. 452, 456 (1997); 29 C.F.R. § 541.2 (2004).

The DOL regulations that implement these provisions of the FLSA contain a "long test" and a "short test" for determining whether an employee is a bona fide executive.[1] *Jones v. ENSR Corp.*, No. 96-3836, 1997 WL 369440, at *2 (6th Cir. July 1, 1997); *see also Hays v. City of Pauls Valley*, 74 F.3d 1002, 1006 (10th Cir. 1996). The short test applies to employees who have a salary of more than $250 per week, and the long test applies to employees who make between $155 and $250 per week. *Jones*, 1997 WL 369440, at *2; 29 C.F.R. § 541.1(f) (2004). Under the short test an executive employee is exempt from the overtime provisions of the FLSA if: (1) the employee is paid on a salary basis not less than $250 per week; (2) the employee's primary duty consists of management of the enterprise in which he is employed or of a customarily recognized department or subdivision of that enterprise; and (3) the employee

---

[1] The regulations were amended in August of 2004. Because the events at issue here took place prior to 2004, and because the bulk of those events occurred during 2004, culminating with the plaintiff's termination on March 30, 2004, the court will apply the 2004 regulations to this case. *See Atlanta Int'l Ins. Co. v. Faulkner*, No. 86-1747, 1987 WL 37796, at *4 n.1 (6th Cir. June 25, 1987) (applying the ICC regulations as they existed prior to their amendment because those regulations were in effect when the lease was executed, the accident happened, and the suit was filed). The defendant agrees that the pre-August 2004 regulations apply (Docket No. 18 at 8), and the plaintiff makes no argument on this issue.

9

customarily and regularly directs the work of two or more other employees. 29 C.F.R. § 541.1(f).

The employer bears the burden of proving that an employee fits into the exemption. *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997); *see also Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 515 (6th Cir. 2004). The employer must establish the exemption through a "preponderance of the clear and affirmative evidence." *Renfro*, 370 F.3d at 515 (citing *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 691 (6th Cir. 2002)). The exemption is to be narrowly construed against the employer seeking to assert it. *See Ale*, 269 F.3d at 691; *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 740 (6th Cir. 2000) (citing *Douglas*, 113 F.3d at 70).

Here, it is undisputed that the plaintiff received a salary of at least $38,000 per year as well as bonuses while he was employed by the defendant. (Docket No. 23 at ¶ 17.) At a minimum, then, plaintiff received a salary of at least $730 per week. Because the plaintiff received a salary of more than $250 per week, the court applies the short test to determine whether he qualifies as a bona fide executive. In addition, his salary satisfies the first element of the test.

This case turns on the second element of the short test, which requires that the employee's "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.1(f). The regulations state that, when a business is made up of several establishments, "the employee in charge of each establishment may be considered in charge of a subdivision of the enterprise." 29 C.F.R. § 541.104(b) (2004). The defendant here runs gas stations and convenience stores in several states, and the plaintiff, as Store Manager, was the highest ranking

employee at one of those stores.  (Docket No. 23 at ¶¶ 1, 7.)  Therefore, the plaintiff was a Store Manager at what was a "customarily recognized subdivision" of the defendant's business.

To be an exempt executive, the plaintiff must also have performed "managerial and supervisory functions" at that department or subdivision.  29 C.F.R. § 541.102(a) (2004).  The regulations state that these functions are generally easily recognizable and give a list of the type of work that is generally considered exempt, including selecting new employees, training employees, setting pay levels and hours of work for employees, handling complaints and grievances, and disciplining when necessary.  Id. at § 541.102(a)–(b).  It is undisputed that the plaintiff, among other duties, staffed the store, scheduled employees, disciplined employees, trained new employees on various issues, and handled complaints.  (Docket No. 23 at ¶ 7.) These are easily recognizable as management duties.  In addition, the plaintiff admits in his brief that he "does not suggest that all of these duties were non-managerial; that is by no means the case."  (Docket No. 22 at 4.)  The brief concedes that "some of Mr. Light's routine functions were to count the money, and reconcile the daily books, schedule employee work times, schedule employee vacations, and oversee inventory . . . These are, arguably at least, executive functions and if he had no other responsibility he would be an exempt employee."[2]  Id.  Thus, the court concludes that the plaintiff performed substantial managerial and supervisory functions.

Both parties agree that the plaintiff performed both exempt (management) work and non-exempt work. The issue is whether his management duties comprised his "primary duty."  This determination is to be made based on the facts of each particular case, but the regulations suggest that "a good rule of thumb" is that when management takes over fifty percent of an employee's

_____

[2] The plaintiff goes on to argue that, although he did perform some managerial functions, he spent more time doing non-exempt duties.  (Docket No. 22 at 4.)

time, management is his or her primary duty. 29 C.F.R. § 541.103 (2004). However time is not the only test. *Id*. Other pertinent factors include:

> the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises his discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

*Id*. In *Jones*, the Sixth Circuit found that a field supervisor's primary duty was managerial, regardless of the fact that he performed both labor and management duties. *Jones*, 1997 WL 369440, at *4 (6th Cir. July 1, 1997). In making this determination, the Court relied on the plaintiff's own testimony that he was "the guy in charge," that he wore a distinguishable uniform from his crew, and that he reported job progress to his supervisors, interviewed crew members, trained technicians, and set his workers' hours. *Id*. at *3. *See also Ale*, 269 F.3d at 692 (finding that shift supervisors did not have management as their primary duty because they had no control over the people they supervised and their primary responsibility was performing clerical duties); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 617–18 (8th Cir. 1991) (holding that managers' spending sixty-five to ninety percent of their time on non-managerial duties was not dispositive with respect to determining whether they were non-exempt employees); *Anderson v. City of Cleveland*, 90 F. Supp. 2d 906, 914–15 (E.D. Tenn. 2000) (finding that the fact that the plaintiffs often work with subordinates in the field was not fatal to the claim that management is their primary duty); *Cowan v. Treetop Enters., Inc.*, 120 F. Supp. 2d 672, 691–692 (M.D. Tenn. 1999) (noting the above cases, but finding that the "primary duty" element was not met because the primary duty of the "unit manager" was to cook, a non-managerial function).

The plaintiff argues that he spent more time doing non-exempt duties than he did doing exempt duties, specifically filling in for absent employees, cleaning restrooms, and painting the outside of several stores. (Docket No. 22 at 4.) He estimated that he worked fifteen hours per

week on average in addition to his scheduled number of hours and that thirty percent of those additional hours were spent filling in for an absent employee. (Docket No. 16, Ex. B, Light Dep. at 123.) However, although the plaintiff did testify that he was spending more time doing non-exempt duties during the year leading up to his termination, there is very little evidence in the record of how many hours the plaintiff actually spent doing one activity versus another. *Id*. at 146, 152. Because time is not the only factor in determining an employee's "primary duty" (29 C.F.R. § 541.103), the other pertinent factors must be considered.

First is the relative importance of the managerial duties as compared with the other types of duties he performed. The plaintiff himself testified that his duty as store manager was to "oversee the store." (Docket No. 16, Ex. B, Light Dep. at 35.) The plaintiff does not dispute that his "*major responsibilities* were sales growth, profit growth, expense control, inventory control and cash control." (Docket No. 23 at ¶ 7.) (emphasis added). As discussed above, the plaintiff was the highest ranking employee at his store, which was open twenty-four hours per day, seven days per week. When he was not scheduled to work, the plaintiff was "on call" and might have had to go to the store unexpectedly to deal with situations such as customer or vendor problems, computer problems, or other emergencies. *Id*. at ¶ 9.

The plaintiff performed non-exempt duties such as cleaning and painting; however case law and the DOL regulations clearly indicate that the mere performance of non-exempt duties, even a substantial amount of those duties, does not necessarily defeat the executive exemption. Looking at the evidence in the record, even in the light most favorable to the plaintiff, the court finds that this case closely resembles *Jones*, wherein the Court found that a field manager working alongside his employees was still an exempt employee. *Jones*, 1997 WL 369440, at *3–4. The plaintiff worked alongside his employees at the job site, in this case the store, but his

13

job was distinguishable from theirs because he had authority over them and duties above and beyond theirs. The plaintiff's brief states succinctly that the "true nature" of Light's job was that "he did what had to be done." (Docket No. 22 at 4.) When a managerial employee admits that his primary job is "to get the job done," he is a bona fide executive. *Jones*, 1997 WL 369440, at *4 (citing *Murray*, 939 F.2d at 617). The court finds that the time the plaintiff spent performing, and the relative importance of, his managerial duties (when compared to his non-managerial duties) are sufficient factors that suggest that the plaintiff's primary duty was management.

Additional evidence supports this conclusion. Again turning to the "other pertinent factors" that the regulations identify as relevant to analyzing an employer's primary duty, the plaintiff was frequently able to exercise his discretion in interviewing, terminating, disciplining, and scheduling employees, placing orders, and planning to meet store goals. (Docket No. 23 at ¶ 7.) The plaintiff was the highest ranking employee in charge of his store only. The next highest ranking employee was the district manager, who supervised an average of twelve different stores at a time. (Docket No. 16, Ex. B, Light Dep. at 133; Docket No. 16, Exhibit C, Deposition of Randy Charles Wilson at 6.) With the district manager in charge of so many stores, the plaintiff exercised relative autonomy. With respect to the relationship between his salary and the wages paid to his employees for doing similar work, the plaintiff made nearly twice the amount of the other employees at his store, and he was the only employee eligible for bonuses. (Docket No. 23 at ¶¶ 5, 28.)

The plaintiff managed a convenience store that was a "customarily and recognized subdivision" of MAPCO. He admits that he performed managerial functions and only disputes whether that was his primary duty. Viewing the evidence in the light most favorable to the plaintiff, the relative importance of his management functions to his other duties, together with

the time spent on management duties, his freedom from supervision, and his salary, are sufficient factors for the court to conclude that the plaintiff's primary duty was management, and that he, therefore, comes within the second element of the short test.

The third and final element of the "bona fide executive" short test requires that the employee customarily and regularly direct the work of two or more employees. 29 C.F.R. § 541.1. The regulations define "customarily and regularly" as "a frequency which must be greater than occasionally but which, of course, may be less than constant." 29 C.F.R. § 541.107(b) (2004). The employee satisfies the second component, "two or more employees," if he supervises "at least two full-time employees or the equivalent thereof." 29 C.F.R. § 541.105(a) (2004). Courts have also held that the executive employee does not actually have to be present at the work site during all of those hours to be considered a "supervising" employee. *See Haines v. Southern Retailers*, 939 F.Supp. 441, 446 (E.D. Va. 1996).

Here, the plaintiff was the only Store Manager at his store and was responsible for supervising all the employees in his store at any given time, which could be as many as six employees. (Docket No. 23 at ¶ 12.) At a time when the plaintiff testified that the store was "shorthanded" the plaintiff had at least three other employees on staff, which suggests that the store usually had more than that number on the payroll. (Docket No. 16, Ex. B, Light Dep. at 162-64.) The fact that the plaintiff managed a staff of three to six employees is sufficient to make out the third element of the executive exemption short test.

Given the record, the descriptions the plaintiff gave in his deposition of his own job, and the undisputed facts, even drawing all inferences in favor of the plaintiff, the employer has demonstrated that no reasonable factfinder would be able to find that the plaintiff is not an

exempt employee. Therefore, the defendant's Motion for Summary Judgment will be granted as to the plaintiff's claim for overtime compensation.

### C. FLSA Retaliation

In addition to claiming that he was entitled to overtime compensation under Section 207 of the FLSA, the plaintiff also claims that he was terminated in retaliation for complaining to his employer about his pay. (Docket No. 22 at 5.)

Section 215 of the FLSA makes it unlawful for an employer to terminate an employee in retaliation for (1) filing a complaint against the employer; (2) instituting a proceeding against an employer; or (3) testifying in any proceeding brought under the FLSA. 29 U.S.C. § 215(a)(3). A plaintiff may make out a claim of FLSA retaliation by presenting direct evidence of retaliation or, as in this case, by using circumstantial evidence to create an inference of retaliation. *McDaniel v. Transcender, LLC*, No. 03-5599, 2005 U.S. App. LEXIS 1587, at *14 (6th Cir. Jan. 31, 2005) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997) (applying the *McDonnell Douglas* burden-shifting analysis to FLSA retaliation)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To establish a *prima facie* case of retaliation under the FLSA, the plaintiff must establish that: (1) he engaged in an activity protected by the FLSA; (2) the exercise of that protected right was known to the defendant; (3) thereafter the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *McDaniel*, 2005 U.S. App. LEXIS 1587, at *13; *see also Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004) (acknowledging that the *McDonnell Douglas* burden-shifting analysis is used to determine that a plaintiff was dismissed in retaliation for engaging in an activity protected under the FLSA); *Nguyen v. City of Cleveland*, 229 F.3d 559,

563 (6th Cir. 2000) (discussing the elements required for a *prima facie* case of retaliation in the Title VII context).  Once the plaintiff has established the *prima facie* case, the defendant has the burden of producing some legitimate, nondiscriminatory reason for the action.  *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  Once the defendant has met its burden, it is the plaintiff's burden to show that this proffered reason was pretextual.  *Id.* at 1082.

The defendant argues that the plaintiff fails to state a *prima facie* case of retaliation because his complaints did not constitute a "protected activity" for purposes of the FLSA and because he cannot show a causal connection between his complaints and his termination.[3] (Docket No. 18 at 14, 16.)

The plaintiff asserts that he engaged in an activity protected by the FLSA when he complained to his supervisor about his pay and his hours.  (Docket No. 22 at 5.)  The Sixth Circuit has held that to satisfy the "complaint" requirement of the FLSA's retaliation section, the plaintiff need not file a formal complaint.  *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992).  The Court in *Romeo* held that it is the assertion of a statutory right that is the triggering factor, not the filing of the formal complaint and, therefore, the assertion of a right in an informal manner is a statutorily-protected activity.  *Id.*  The *Romeo* Court cited several other circuits that had found an informal complaint by an employee to be sufficient to satisfy this requirement, and the Sixth Circuit has continued to follow this rule.  *Romeo*, 976 F.2d at 989 (holding that an informal complaint was sufficient to set forth a claim of retaliation where the plaintiff told the school district that she believed they were "breaking some sort of law" by

---

[3] The defendant does not argue that the plaintiff fails to meet any of the other *prima facie* elements, and such an argument would be unavailing, since the plaintiff was terminated—unquestionably an adverse employment action—and, as discussed *infra*, plaintiff's complaints were made to his supervisor and therefore the defendant knew of them.

paying her less than her male counterparts); *see also Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004) (holding that an informal complaint was sufficient when the plaintiff protested to her employer about unequal pay).

In this case, the plaintiff claims that he asserted his statutory right to be treated as non-exempt to his supervisor on multiple occasions. (Docket No. 22 at 5.) The defendant counters that all the plaintiff did was complain about being treated "unfairly." (Docket No. 18 at 15.) However the court finds that the plaintiff presents evidence of a more specific complaint. The plaintiff testified that, during the regular district manager meetings and at other times, he and the other Store Managers complained that they "didn't make enough for what [they] did" and were "working all the hours and not getting compensated for it." (Docket No. 16, Ex. B, Light Dep. at 141.) The plaintiff also claims that he complained approximately one month before his termination to his supervisor, Wilson. *Id*. at 135. The plaintiff testified that he called Wilson at that time and told him, "I was tired of not knowing when I was going to be there and when I wasn't, I was tired of working double shifts … I told him I was tired of all the extra hours." *Id*. at 136–37.

The plaintiff made his complaint to his direct supervisor and he complained specifically about the issues of extra hours and pay. Although this complaint was not formal, the evidence is sufficient to raise a genuine issue of material fact as to whether the plaintiff engaged in a protected activity.

With respect to whether the plaintiff has raised a genuine issue of material fact as to the causation prong of the *prima facie* case, the defendant makes only a limited argument that the plaintiff cannot establish cause and suggests that temporal proximity is insufficient to make this showing. (Docket No. 18 at 16, 19 n.5.) The plaintiff makes no explicit response to this thinly-

advanced argument. Nevertheless, the court concludes that the evidence in the record of a close temporal proximity between the protected activity and the plaintiff's termination raises a genuine issue of material fact as to causation.

In the context of Title VII, upon which the Sixth Circuit has relied to elucidate FLSA retaliation claims, the Sixth Circuit has held that a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in the protected activity. *Nguyen*, 229 F.3d at 563; *McDaniel*, 2005 U.S. App. LEXIS 1587, at *13. No one factor is dispositive in the causation inquiry. *Id*. In *DiCarlo v. Potter*, the Sixth Circuit found that close temporal proximity between two events is sufficient to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive. *See DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004) (finding that causation had been established when the plaintiff was terminated twenty-one days after he engaged in the statutorily-protected activity). This holding does stand in contrast to the Sixth Circuit's prior decisions, including in *Nguyen*, where the court appeared to underscore the fact that it previously had rejected the idea that temporal proximity alone is enough to establish causation. *Nguyen*, 229 F.3d at 566; *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554–55 (6th Cir. 2002); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364–65 (6th Cir. 2001); *see also Steiner v. Henderson*, No. 03-4195, 2005 U.S. App. LEXIS 1584, *9–16 (6th Cir. 2005) (finding that the plaintiff had not shown a causal connection because the plaintiff offered nothing more than temporal proximity, but not mentioning *DiCarlo*). However, the Court has subsequently relied on *DiCarlo* to hold that temporal proximity may alone constitute a causal connection. *See e.g.*, *Muhammed v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (noting that, per *DiCarlo*,

temporal proximity may be "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.").

This court is bound by the explicit holding of the *DiCarlo* Court that close temporal proximity may be enough to establish causation. In this case, the plaintiff's final complaint to Wilson about "double shifts" occurred approximately one month before his termination. (Docket No. 23 at ¶ 18.) Viewing all evidence in the light most favorable to the plaintiff, this short time period is sufficient evidence of a causal connection to satisfy the plaintiff's *prima facie* burden in his FLSA retaliation claim.

Once the plaintiff has established a *prima facie* case, the burden of producing a legitimate, non-discriminatory reason for the adverse employment action falls onto the employer. *McDaniel*, 2005 U.S. App. LEXIS 1587, at *14; *see also Nguyen*, 229 F.3d at 563. As a legitimate non-discriminatory reason, the defendant asserts that the plaintiff was terminated because he permitted an employee who had been cited for selling beer to a minor to continue working at the store. (Docket No. 23 at ¶ 26.) The proffered reason meets the defendant's burden of production and is sufficient to shift the burden back to the plaintiff to establish a genuine issue of material fact that the employer's explanation was pretextual.

To show pretext the "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). To make out a case that the employer's non-discriminatory explanation is pretextual, the plaintiff must show either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer*, 29 F.3d at 1084 (emphasis in original).

The plaintiff in this case makes no mention of any *Manzer* criteria in his brief; instead, he argues that the pretext issue turns on witness credibility, perception, and intent. (Docket No. 22 at 5.) The most generous reading of the plaintiff's argument suggests that he is proceeding under the second *Manzer* showing. This is an indirect showing of pretext met by admitting the defendant's non-discriminatory reason, but then "showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084. The *Manzer* Court expressly held that, to make out this second showing, the plaintiff may not rely on the evidence underlying his *prima facie* case and must instead introduce additional evidence of discrimination. *Id*.

Even if the court infers an argument based on the second *Manzer* showing from this section of the plaintiff's brief, the plaintiff fails to put forward any evidence beyond his *prima facie* case that would support this argument. The plaintiff does not give his own version of the facts that the witnesses would allegedly dispute. Instead, the plaintiff admits the defendant's statement of the facts almost in its entirety. The plaintiff admits that he let Burns continue to work after she received the citation. (Docket No. 23 at ¶ 25.) The plaintiff admits he knew about the defendant's policies regarding the sale of beer to minors. *Id*. The plaintiff admits that he thought Burns would be terminated for her actions. *Id*. The plaintiff admits that no mention was made of his prior complaints about pay and hours at the time of his termination. The plaintiff submits no argument or evidence that would lead a reasonable factfinder to doubt the defendant's motivation or to suggest that his complaint about his hours and pay led to the termination. The plaintiff presents nothing that would suggest that the defendant's legitimate non-discriminatory reason was not the real reason for his termination.

The Sixth Circuit has made it clear that a jury may not simply refuse to believe an employer's legitimate, nondiscriminatory reason for its action unless there is sufficient basis to do so. As that Court stated in *Curtis v. Hanger Prosthetics & Orthotics, Inc.*, "[t]he mere possibility that displeasure with the plaintiff's protected activity might have motivated the company's actions is not sufficient [to establish pretext] -- for otherwise, every prima facie case of retaliation … would create a jury question as to whether the defendant's non-discriminatory explanation was simply pretext." *Curtis v. Hanger Prosthetics & Orthotics, Inc.* No. 02-6265, 2004 U.S. App. LEXIS 11254, at *11–12 (6th Cir. June 4, 2004).

The plaintiff has failed to raise a genuine issue of material fact with regard to pretext and, therefore, cannot meet his required burden. For this reason, the defendant's Motion for Summary Judgment on the claim of FLSA retaliation will be granted.

## Conclusion

For the reasons stated herein, the defendant's Motion for Summary Judgment (Docket No. 16) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge